Pacific Bell Worldcom Network Services v. Pacific Bell Telephone and we've divided up the argument as follows, correct me if I'm wrong, AT&T and MCI, the plaintiff appellants, will argue first for 15 minutes, dividing their time 10-5. Pacific Bell will argue second, dividing their time 15 minutes, 2. Now is the 10-5, is that 10 and then 5 of rebuttal? Or are you dividing between the two parties? No, Your Honor, it's not between the two parties. The 5 is intended to be rebuttal on our affirmative appeal as well as our response to the cause of the appeal. Okay, we'll try to help you keep track of your time. And then finally, the California Public Utilities Commission will have 20 minutes. Counsel ready? That's the understanding of the argument division? Okay. Yes, Your Honor. May it please the Court, my name is Jeffrey Raphael, counsel for MCI on behalf of both the MCI and AT&T appellants. With me today is Randolph Deutsch from the Civil Law Office in Brown and Wood on behalf of AT&T, in case there are any questions directed specifically for AT&T, but I am arguing on behalf of both AT&T and MCI. The Telecommunications Act of 1996 was a landmark statute, which was designed to end historic monopolies in local telephone competition and local telephone markets and rather replace it with robust competition in this industry. The act requires incumbent carriers like Pacific Bell to lease individual network elements to competitive carriers like AT&T and MCI on an unbundled, meaning separately priced basis. The act requires that these network elements be leased at cost-based rates. And Congress gave the FCC the affirmative duty to implement these provisions by setting rates or setting rules for setting rates for the network elements. The FCC did so initially in 1996 in the local competition order and in the codified rules which follow. The FCC provided that the cost of these unbundled network elements, these unis, is to be the sum of what is called the TALREC, that's an acronym for Total Element Long Run Incremental Cost, or to put it another way, the directly attributable costs of the elements, plus a reasonable allocation of the common costs of the company. Would you agree that common costs, as they seem to be defined here, are those costs which would remain both if there were only a retail operation and alternatively they'd still be there if there were only a wholesale operation? Yes, the truly firm-wide common costs as opposed to the shared family costs, which is another category, but the truly common costs would remain in a wholesale only environment. Or even in a retail only. Exactly. Precisely, Your Honor. In fact, we pointed that out in our requirements, which is to say that PACFIL has proven too much. So that's the definition, in other words, a cost that would survive even when you abandon the other half of it or the other line of work. The common costs, as Your Honor correctly points out, support both the retail and the wholesale sides of the operations and cannot be attributed to either separately. It cannot be attributed either to the family of wholesale or retail separately or individual elements or services. And that's actually the very definition that the FCC chose for its regulation as to what the common costs encompass. In our agenda, in A15, 47 CFR 51.505, the FCC codified that the forelooking common costs are those that cannot be attributed directly to individual elements or services. That's the very definition of what is remaining when you boil them down to the truly common costs. Beyond just the codified rules, the FCC in its full competition order spelled this out a little bit further. And it specified, and this is page 825 of our addendum, paragraph 676, that such costs, meaning the common costs, may be common to all services provided by the firm or common to only a subset of those services or elements. The latter portion of that sentence refers to those shared family costs that we referred to, if they can be so attributed. But the other ones, the ones that are common to all services provided by the firm, are firm-wide common costs attributable equally or in some indivisible way to the retail and the wholesale operations. Indeed, the FCC went further in paragraph 694 on page 829 of our addendum and said that, quote, common costs also include costs incurred by the firm's operations as a whole that are common to all services and elements, e.g. salaries of executives involved in overseeing all activities of the business. In other words, it was looking at it as those that are less, that support both the retail and the wholesale and, indeed, other operations. In the FCC, the same paragraph went on in that same sentence. I don't want to take this out of context. It went on in the same sentence to say that those common costs shall specifically exclude those that are retail costs, which is to say that costs which directly support, directly are attributable to the retail, must be excluded from the common costs because those are not truly common. And the purpose of this exercise was to boil down the common costs to those that are truly common before they are allocated reasonably among elements and services. And finally, in paragraph 696, pages 830 through 831 of our addendum, the FCC then said, we conclude that forward-looking common costs shall be allocated among elements and services in a reasonable manner, consistent with the pro-competitive goals of the 1996 Act. So there it's talking about the same common costs that's already defined as those that are firm-wide, common to all of the firm, such as the president's salary, the paradigmatic example. And that those shall be allocated among elements and services, everything of the firm, not just the elements, in a reasonable manner. So there is some latitude once these other rules are complied with, as long as it's reasonable. But it also must be consistent with the pro-competitive goals of the 1996 Act. We submit in this appeal that the TUC, the Public Utilities Commission, erred because it did not allocate the common costs, the truly firm-wide common costs, in a reasonable manner among the elements and services. Rather, what it did was decide that the elements and services' common costs should be allocated only to the wholesale elements. And we believe this was error. It was inconsistent with what the FCC said ought to be done in coming up with this allocation. And we believe that should be reversed. If there's any doubt as to what the FCC's intent was, beyond the language I've already cited as to what it viewed as the common costs, the firm-wide common costs, are those that support both wholesale and retail, and therefore for an apples-to-apples comparison, one ought to have allocated among all services the wholesale and retail. If there's any doubt about that, then one might look beyond in the Communications Act for other indications of the FCC's meaning. And I suggest that one of the statutes, I'm sorry, one of the regulations which Pacific Bell itself cited in this brief, 47 CFR 64.901, and it was cited in the PacBell brief and attached in its addendum at page 16 of its addendum, said specifically that, this is the regulation, quote, a telecommunications carrier, this is subsection C of the regulation, quote, a telecommunications carrier may not use services that are not competitive to subsidize services subject to competition, close quote. Now I'm not suggesting here that that's the basis of our appeal, that there was a failure to comply with that particular provision, but rather what I'm suggesting is that in helping to understand what the meaning of the FCC's rule is about allocation, that is that it must, that those truly common costs must be allocated among elements and services in a reasonable manner consistent with the pro-competitive goals of the 1996 Act, one could look at other elsewhere in FCC regulations and see that the FCC did not, frowned upon subsidization of the non-competitive services. Now the means by which they did what you, or which you complained was to put the common costs in enumerators. For the wholesale operation. I gather. And determining their, getting to their markup formula. Yes. Our proposal was that it shouldn't include the, not just the wholesale direct costs in the denominator, but should also have included the retail and other costs of the company in the denominator. Their explanation for this was that retail costs had already been eliminated from the numerator. I think they said something like that. Yes, Your Honor. That was the FCC's justification. And we believe that was, first of all, as a matter of law, impossible. And secondly, if the court needs to reach the second stage, as a factual matter, that's not what happened here. First, as a legal matter, the common costs, by their very definition, are those that cannot be directly attributed to either retail or wholesale. Therefore, it was not possible to separate those out once you have the truly common costs. Instead, what happened was, in the earlier cost proceeding, was there were certain costs that we and others intended were actually direct retail costs that had not yet been removed and needed to be removed so that all directly attributable retail costs were out of the common cost bucket. And the PUC disagreed with the amount of such retail costs that we believe ought to be removed. They agreed that some ought to be removed to the tune of $68 million. Those were taken out, but those were the direct retail costs, the ones that they could separate out. And in case there's any doubt beyond that, if one looks back at what the PUC did, it's clear that even if it could theoretically have done what legally it was impossible to do, it didn't do that. Or if it did so, to the extent it did so, then that was plainly arbitrary. So is your argument that, as I understand it, instead of reducing it by $200 million, they reduced it by $68 million? Is your argument it was arbitrary and capricious to simply pick the $68 million figure? Our argument at this stage, and in this district where we're also challenging the specific number chosen, we are no longer pursuing that portion of the appeal about the numerator. What we are contending here is that the allocation must have been among all elements of services, both through retail and wholesale. Yet the PUC's justification for why it did not need to do that, why it did not need to include anything but the wholesale and the denominator, is that somehow it did what could not be done mystically and had already, it's my term now, pre-allocated the retail and wholesale in the denominator. Then our response is, no, that's not what the $68 million was. The $68 million was a removal of direct retail costs that could be attributed and which needed to be removed so that they were truly common costs. I want to save at least a few minutes of my time for the response and rebuttal. I'm going to follow up on that last point. The 1999 order in which the PUC set the common cost markup, the PUC thought that it somehow had done what I call pre-allocation by mystically separating out the retail portion, not simply direct retail costs, but somehow did what could not be done and boiled down to something that was wholly wholesale. That's what it thought it was doing in 1999, but it was relying on its February 1998 decision. Let me just refer to the 1998 decision, which is where it actually removed the $68 million. This is in the ER page 58 and ER page 67-68 of this appellate record. In the 1998 order, the PUC made clear that in responding to criticism by AT&T and MCI as to which direct retail costs ought to be removed, they say that they agree, the Pacific should exclude about $68 million in retail costs from the shared common category. That was on page 53 of the order, which is page ER 58 of the record. Earlier in that page, they said that AT&T and MCI, characterizing the argument, was that AT&T and MCI, quote, contend that a large amount of the costs identified by Pacific as shared and common are in fact related to provision of retail service and so must be excluded under seller principles. And when the PUC then went ahead and decided to remove the $68 million, it mentioned that even Pacific had acknowledged that it would be conceptually improper to attempt to remove retail expenses from the total of shared common costs, referring to the Shull Declaration, the Pacific's witness. Agreed that seller principles require the removal of retail costs from the prices of units because retail costs are not attributable to the production of network elements that are offered to interconnecting carriers. This is page 62 of the 1998 order, page ER. I think we've got that. Why don't you save the rest of your time? Okay. Thank you, Your Honor. Now, I've got a 13 and 2. What's the 2 for? The 2 would be rebuttal in support of our cross-appeal. So my plan would be to address MCI's challenge to the common cost markup, Your Honor, and then turn to Pacific Bell's cross-appeal, saving a few minutes for rebuttal in support of our cross-appeal. So you think you're going to go 13 and then he goes 5 and then you go 2? That would be my hope. That would be your hope? Assuming I can save a few minutes for it. Okay. And how does the PUC fit in here? Do they talk after you and you both say 5 and 2 and we hear from the PUC for 20? The PUC, after we argue, the PUC would then have an opportunity to address both MCI's appeal and Pacific Bell's appeal. But after you've had your cross-rebuttals, or do you want to hear from the PUC just in case there's something they say you guys would like to speak to? Sorry. I apologize, Your Honor. After I speak, the PUC would speak and then MCI would speak. I got it. That makes sense. Okay. Thank you, Your Honor. May it please the Court, Colin Stretch on behalf of Pacific Bell, as I indicated, I'd like to address first MCI's challenge to the common cost markup and then address Pacific Bell's appeal. MCI makes essentially two claims with respect to the markup. One is that the markup in practice forces them to subsidize Pacific Bell's retail services, and two, that the markup is inconsistent with the FCC's 1996 local competition order, and I'd like to address those arguments in turn. As an initial matter, though, to respond to Judge Candy's initial question, I would like to make clear that the numerator of the common cost markup are the common costs that Pacific would incur in a hypothetical wholesale-only environment. That is to say, let's assume that Pacific exits the retail market entirely. It therefore avoids all costs directly attributable to retail services. Now, some of those costs might be considered common in the sense that we're Wait a minute. Not by your definition. I mean Yes. No, I think I understand where the confusion lies here. There are, in this appeal, the parties have litigated the term common cost to include both true common costs, which are common to both wholesale and retail, and to use a good example of those, Your Honor, Pacific's network is approximately 18.5 million access lines, and Pacific has approximately 30,000 technicians that are responsible for maintaining those lines. Now, those personnel have pension benefits. They have payrolls. Those people exist, and they do their job, and their pensions exist, and they have to be paid, regardless of whether the access lines are used for wholesale or retail services. Now, that would be a true common cost. Those support expenses for those individuals. There's also a concept known as shared costs. Now, shared costs can be distinguished between wholesale and retail. Take, for example, the account representatives that Pacific Bell employs to interact with CLEX, the competitive carriers such as MCI and AT&T. Now, those people are responsible for an entire account. Their cost cannot be attributed directly to individual network elements. You can't put a certain percentage of them on the loop and a certain percentage on the switch. Those are shared costs among Pacific Bell's wholesale operation. On the retail side, you also have shared costs. You have, say, a group of sales representatives who spend their time calling individuals and trying to convince them to subscribe to more services. Now, they sit in a building. That building has costs. They get paid. When they go away, when the retail operation goes away, those costs go away as well. And those costs, those shared costs on the retail side, were excluded from the numerator. The shared costs, the costs associated with the account team on the wholesale side, are included in the numerator. So, it's a fairly subtle distinction, but the critical point to keep in mind, and this is something the district court recognized as well as, obviously, the PUC, is to see that the numerator we're talking about here are the costs that would remain in exclusively a wholesale environment. That is to say, we get rid of the retail business entirely. What costs are left? The costs associated, again, with these 30,000 technicians. We're still maintaining this network with 18.5 million lines. If that's in the numerator, then those costs and the only costs that are in the denominator are wholesale costs. Well, that's true. It's really the direct costs of the entire network. So, the cost of each one of those 18.5 million lines is in the denominator. It's the direct cost of the entire regulated network calculated according to the FCC's wholesale methodology. So, what you have is basically you're imagining this hypothetical world in which the network is as big as it is today, and what are the common costs that Pacific incurs in operating this network? And in the denominator, what are the total costs? You mean you're assuming that the entire network, as big as it is today, is wholesale? I'm sorry. You're assuming that the network is as big as it is today and is operated solely for wholesale purposes? That's exactly correct, Your Honor. You have the entire network, and it's the wholesale common costs of that entire network in the numerator, and in the denominator, you have the direct costs of the entire network. That's the apples-to-apples comparison that the PUC and the district court describe. Now, MCI's claim here is that, well, in practice, paying that markup forces them to subsidize Pacific Delta. Let me work on this numerator-denominator business. I was puzzled by the district court's use of the word hypothetical, and now, again, your use of the word hypothetical. As I understood the district court, what it was saying is, let's figure out a cost structure here based on an assumption that the retail operation disappears entirely. Yes. And what remains, then, as common costs, we will attribute entirely to the wholesale, the UNEs, that are now kind of the cost for those, and that's what we put in the denominators. Am I getting it right? You're getting it right in the sense that the denominator is calculated according to the UNE methodology, but it's not just the UNEs that we sell to MCI. It's the entire network. So you've got the entire network in the denominator. What costs are excluded that they say should be included in the denominator, putting to one side the Category 3? The costs that they think should be in the denominator are directly attributable retail costs. And, frankly, this would be a question that's better put to MCI and all. I understand. Conceptually, that's exactly the answer I'm interested in getting. Okay, now that I've gotten that, well, if you do not include those retail costs, what you're doing is you are attributing entirely to the UNEs, or the only cost that you're putting in there, the entire overhead based on this hypothetical of what would happen if we eliminated the retail business entirely. I looked in vain in any document decided to determine by the FCC for the term hypothetical. What you've done is you've allocated the wholesale entirely to the UNE and the non-retail costs. That is to say you've not allocated. It's critical to understand here how this market works in practice because I think that's what you're driving at here. Now, this is a market that works in practice on a pay-as-you-go basis. So, if MCI purchases 10% of the network as UNEs, they pay 10% of the numerator. If they buy 50% of the network, they pay 50% the numerator. In either case, the remaining part of the network, in the first instance 90% of the network, in the second instance 50%, is being used by Pacific. Pacific is still using those network elements. Pacific is still using those network elements to provide retail services, and it's Pacific that must recover the remaining 90% in the first example of 50% of the numerator. So, the common costs are in no way paid exclusively by MCI except in one instance. The only instance where they would pay the entire numerator is when they buy the entire network. In that case, we are out of the retail business entirely. I guess the concern, though, is that the rate at which they are marked up is distorted because in this hypothetical example, they wind up having all of the costs, all of the common costs allocated to their side of the operation. That's simply not the case, your honor. Respectfully, again, the common costs they pay are these common costs. Let's think about the technicians. Okay, there's 30,000 of them, and let's say there are common costs of $100,000 in a given year associated with those folks doing their jobs, which they're going to do regardless of whether the access lines are used by Pacific Bell to provide retail services or by MCI to provide retail services. If they buy 10% of the network, they pay 10% of this $100,000. We pay 90% of this $100,000. It works in fair proportion. Each party pays the common costs associated with this network to the extent that they use the network. No, that's not how that formula works. As I understand it, you've got a formula that produces a percentage markup. That's correct, your honor. So it's not I buy 10% of the network, and I therefore pay 10% of the common costs. It is I buy 10% of the network, and you add that percentage markup to what I buy. Respectfully, yes, your honor. And then the question is how do you calculate that percentage markup, and as you calculate that percentage markup, do you put in the denominator all of the costs? You only want to put some of the costs into it. Your honor, the costs that are in the denominator are the direct costs, again, of the entire network. Now, you take, for example, excluding retail costs. Why are those excluded? Because they are participating in the benefit from the common costs. Your honor, we are recovering them. We're recovering them separately from this markup. Here's the way. Well, maybe that's double-counting. I'm not sure you answered my question. If I didn't, I apologize, your honor, and I may ask you to repeat it. Well, what I'm after is you've got common costs that are, by definition, costs that go to satisfying both the wholesale side and the retail side. That's correct. And those common costs are to be shared in some reasonable way under the FCC's order. That's correct. And the way that you've chosen to do this, or rather the way that the PUC has chosen to do this, is to figure out a percentage markup based upon, okay, what are all the costs, retail and wholesale, and how do we share that? That's your markup. You've chosen, as I understand it, you've chosen to eliminate the retail so that we're deciding the percentage markup based only on dividing the common costs by the wholesale. Your honor, we've eliminated the retail from both sides. Oh, well, then do you lose if we conclude that that $68 million did not take out the retail side of the common costs? Well, it depends on what precisely you mean by take out the retail side of the common costs. That is to say, if that $996 million is true common costs, That's right. Okay. You didn't take out the retail part of the common costs. That's incorrect, your honor. These are the common costs that we would incur with no retail business entirely. Get rid of the sales representatives. Get rid of the building they sit in. Get rid of all the payroll associated with them. They don't exist in this world. But also incur all those costs if you got rid of the wholesale. Well, respectfully, your honor, that goes back to my initial point, which is actually that's not the case because there are common shared costs in the numerator. But if you wanted to do it the other way, basically, if you wanted to include retail costs and come up with what MCI has said the FCC requires, which is a firm wide number, what you would have to do is get everything in the numerator. In other words, all of the shared costs that we avoid in exiting the retail market, you have to put those in the numerator too. Now, what they want to do is they want to take this narrow amount of common costs, okay, that would exist only in a wholesale environment. And it's important to remember here that originally, prior to the 1996 Act, we had a study that had been approved by the PUC that identified $1.7 billion, okay, in shared and common costs associated with both wholesale and retail. Now, $500 million of those, after the 1996 Act, were gone. So we made a very substantial notch off about a third of the numerator in order to identify this wholesale only common cost figure, okay. Now, those costs... Wholesale only, which also is, of course, also retail only, correct? Well, many of those costs would be incurred regardless of its wholesale or retail. By definition of common costs, all have to be both common to wholesale and retail. Well, Your Honor, respectfully, the FCC's regulations say that they may. If you look at 51.505C, it defines common costs as the common costs which may include the common costs of all elements or services. It certainly leaves the PUC discretion to say, well, you know what, we want to look at the common costs that would exist in a wholesale only world. And if you do that and you put the direct cost, again, of the entire network in the denominator, that is apples to apples. So then the question wouldn't then be whether they could do it but whether they did do it. Did you want to save some time? We're running you over. I do want to just make a quick final point and then note our cross-appeal. I just want to encourage the court to look at the sources that MCI has cited for the proposition that the PUC did not, in fact, properly calculate the numerator, that it was arbitrary. This claim was waived in the district court. They've encouraged the court to look at both their opening brief and their reply brief, and I would encourage the court to do the same because the argument is not there. And it's for that reason that it's not addressed in the district court's otherwise comprehensive opinion. As to Pacific Bell's cross-appeal, just one very brief point relating to OSS recurring costs. The rationale the PUC invoked for refusing to permit us to cover those common costs was that we had not appealed an interlocutory, I'm sorry, Thank you. Thank you. Before you sit down, or actually I'll address the question to Ms. Dumas here. Dumas. I'm sorry? My name is Dumas. Dumas? Yeah. Get yourself set up and then we'll. My name is Gretchen Dumas, and I work in the California Public Utilities Commission. It's a very complex case. Ms. Dumas, the question I was going to ask Mr. Stretch was, what may PACBEL do now to submit revised cost studies to the PUC for reconsideration? Your brief said that there's options that are still open. Oh, absolutely. Just to kind of give you some explanation, at the time that the decision was made that the SEC had not given, had not supplied the PUC with sufficient evidence that they had recurring costs, was really at the beginning of the process of beginning the competitive market. And as far as we were concerned, we looked at OSS costs being all their general operational costs, that the minimum amount that was going to be considered to be part of the recurring cost. And, you know, in a sense, what they were asking for was almost like a rent on top of the actual cost of the unrolled network, as far as we were concerned. However, that number could easily have changed and can easily change in the future as the market becomes more competitive. And if, in fact, the competitors use their network in the way we're describing in the unbundled network world, they have not come back to us. We gave them a couple of different opportunities. And for them to say that the only thing that we're upset about is they didn't appeal our order, sort of ignores what our order said. I mean, they didn't appeal our order, but they never really argued that their cost study actually was adequate, or, I mean, never really protested the fact that we found the cost to be adequate. What's open to them now? That's what I was trying to say. Oh, a petition for modification. I was just trying to think of whether our local competition proceeding is still open. I can't tell you right now. It probably is that far. When we started off in this process, that was our umbrella proceeding. But, clearly, this is an issue that they have no problem coming back to us. They can file an application in that proceeding. They can file a petition for modification. There's just simply no reason why they can't come back to us, if they, in fact, have the evidence. And they haven't done so. And they've also written us a letter saying they don't want to come back to us. So we're kind of left. Probably they would have to present new cost studies. Absolutely. And they'd have to prove that, in fact, they did have recurring costs. Okay. Are we to the commission over-attribute common costs to the wholesale operation? I'm just trying to get to the point where we're arguing with the other council about or inquiring of them. Does the formula now wind up subsidizing some of the common costs of the retail operation at the expense of the wholesale operation? No, Your Honor. That's not. I mean, part of what the confusion here is that we were asked by the FCC to do something that really is not exactly a logical thing to do, but, in fact, in the world of cost studies has some logic. And that is we were asked to apply the Telerik methodology. And I think when you look at this, you have to sort of shift into the Telerik world and the rules of the Telerik world to then answer that question. And the things that the FCC told us, they had the 800-page order and they had just a few pages on what we were supposed to do. They basically left the job to the states and gave us a lot of leeway. They told us it needed to be forward-looking, that it had to replicate a competitive market, which at that time did not exist. And that's where, when you mention the word hypothetical, I think that maybe the FCC didn't use the word hypothetical, but it just jumps to mind because we're really replicating something that, at least at the time, didn't exist. And that the way they wanted us to think about it was that we were looking at a wholesale market only. Now, clearly, in reality, we don't have that situation where FCC is simply a wholesale market, but, in fact, in our construct that we needed to do under Telerik, we had to think about it that way. And one of the most important things goes to your question. The most important thing we were also told to do was to exclude retail costs, and so that was one of our main jobs, was to go through and, in every turn that we could, was to exclude costs. But we had to do it within the time frame of how they had told us to do in terms of Telerik, in terms of this wholesale market. And so, for example, we talk about the president's salary. Clearly, there would be a president if he had a wholesale company or not. There would be a president if he just had a retail company. There would be a president if he had a wholesale and a retail company. So the fact is that under the Telerik methodology, some of that, of the cost of that president's salary, would have to go over to the wholesale side. And we tried to – that was one of the things that we were aware of and we were attempting to do and we considered to be important. But in the hypothetical, his whole salary goes into the numerator. No, not in the hypothetical, because it wouldn't necessarily – I mean, there was some awareness of the fact that, in reality, that that – I believe the PUC did give credence to the fact that – in fact, I know the PUC gave credence to the fact that some of that salary – because we took out retail costs and we basically went through – because it initially came back after – we'd asked them to do a different kind of cost study before the 96 Act, because we were already involved in this process. And when they came, we told them to redo that study to be a Telerik study. They came in at $2.2 billion. We took a billion off of it. And then when AT&T, MCI, WorldCom came in and said, we think another $200 million needs to be taken off. I thought you were offering the president's salary as an example of a common cost. It's one that's going to stay the same no matter – Well, it is something that stays the same, but what I'm trying to say is that under the Telerik methodology, there would be – some portion of it would go to the wholesale, some portion would go to the retail, and we attempted to divide that up in what we thought was the fairest manner. And that's – It would be allocated, but it wouldn't – I think the entire salary would be a common cost. Well, I guess in terms of just using the word generally, it's a common cost, yeah. And as a common cost, given the formula of numerator-denominator as a common cost, the entire salary goes into the denominator? No. It goes into the numerator? No, I guess I'm saying that, in fact, if you look at the – when AT&T – Oh, I see. Let me interrupt because I think I've got it now. You are telling us that your view of what you've put into the numerator does not – you've already allocated, and so the common cost is not what's in the numerator. You've only put, in your view, into the numerator, the share for the wholesale operation of the common cost. That's correct. But that doesn't seem to me, as I read the order that we've been pointed to, that doesn't seem to me what you did. Where in the order does it say that you did what you just said you did? Well, I think – Well, I guess – I believe that the judge – I'm sorry, if I can focus on – Where does it say in what you folks did that that's what you did? Yeah, I think that in our 99 decisions, which is sort of the decision where we pulled in together all of our different decisions in this area, that we discussed this – we have a discussion on the numerator and we have a discussion on the denominator, and in that decision we discussed that this is the way in which we had done it. This is the way we thought the FCC had told us to do it. This may be more precise than you're prepared to answer. I'm asking you to point to me where in the order you say this. I'd like to read the language because I can't find it. Okay, all right. I'll have to – my counsel, I hope, will help me with that. It's hard to – I don't have it with me at the second because it's a very long order. You see, what I've been doing – I've been pointed to and I've read – in fact, I've read the whole order. I see language that leads me to believe that what you've done for common cost, that $996 million, is an unallocated common cost. That is to say it's a true common cost shared between retail and wholesale. And I see language that entirely supports that interpretation, and I did not myself point to it. I see language that supports your interpretation of what you did. Well, I think you have to look – I think the important thing is the real decision that's at issue here is the 98 decision, 98-02-106, because this is when, in fact, the activity that really is at issue here happened. And that's the decision where what I just said was – That's the decision I read. Now, what you're explaining, at least it seems to me, is not consistent with the rationale that the district court gave. As I understand it, as I understand the district court's order, the district court says these are true common costs shared between wholesale and resale. But I'm going to hypothesize a company that now does only wholesale, and those common costs will persist because they are common costs. And because I'm now hypothesizing a company that does only wholesale, I will put into the denominator only the cost of the wholesale operation. That's what the district court – or at least that's how I read the district court. I believe that's what they did say, but I think that district court disagrees with you as to what's in the numerator. I think that that's true, but I think that I'm kind of giving you a further nuance of how the PUC actually did it. I think that, in fact, that's true, that we would consider that to be – a lot of this is just defining what the terms are and how we're calling things, which is one of the difficulties in this case. And I guess I was going kind of back in a little more detail about what our thinking was, but I think that's true, that's what the district court did say. But I have to give you a fair warning. I think you need to persuade me that what you have as a common cost number, the $996 million, has taken out of that the share of the common costs allocable to retail. And you have not persuaded me of that so far. Well, Your Honor, I think that in the 98-02-106 decision, AT&T, NCI, WorldCom came to us and said there was $200 million in retail costs that needed to be taken out. And we basically agreed with them. And we went down account by account and we made changes. Now, we did not make – in some instances we made the exact change they wanted or similar to what they wanted. In other cases we didn't. But the fact of the matter is that we did agree that there were some retail costs. The reason we did not make all of the changes that they wanted was because some of the changes they wanted, we felt coincided with what we believe was the Telric methodology and what we were told to do under the Telric methodology. And that's really what I'm trying to discuss here, in terms of the President pointing you to the language that we just had read to us. And I read it the same way as the plaintiffs do. I'm on page ER68, which is 63 of your order, under discussion. Our own examination of the expenses the Pacific has designated as shared common indicates that some of these costs cannot truly be considered as common because they have a clear retail component. So you exclude the $68 million because it has a clear retail component. That is to say, they are attributed costs. They are not common costs. Well, I think you have to get back to what the FCC told us to do. And that's really, I think, where the problem exists. What they told us to do is to set up this wholesale market. And in doing so, there was exactly this kind of conflict. And I think that what we attempted to do is to take out the retail costs that we considered to be directly attributable retail costs. And there were, as you say, sort of overall arching costs that kind of you could see, depending on what kind of a company you had, retail or wholesale would still be there. And we attempted to do something to ameliorate that, but in fact, because we were told by the FCC that that's what we were supposed to do, you know, we did, we, I think, made a factual finding and we made some policy decisions about exactly how that should be done. This model, this hypothetical model, does it contemplate that the wholesale operation encompasses the whole physical system? Theoretically, yes. That's the model? What did you say, the model? Oh, your hypothetical. I mean, you're trying to, I'm trying to get back at the denominator. It's something that counsel just argued and said, and that is if the model you're dealing with is wholly hypothetical, you've excluded the retail operation completely, and the denominator you have are all the costs that would be associated with the wholesale, if it were the only operation you had. Right. And then you've got the common costs above that. What I want to, I guess what I'm trying to think of is whether the wholesale costs that are stuck into the denominator are really replacing retail costs because there is no retail operation. Well, I guess the complication here, I understand what you're saying. If you're dealing in a universe where there just is no retail, then it may not make sense to add retail costs into the denominator. Right. But I guess we were told the complication in all this is that we are dealing in a hypothetical world, and therefore it's very difficult when you're dealing in a hypothetical world and you have a real world standing right next to you to sort of figure out exactly, you know, where the costs should go. And I think the PUC, you know, it's a yeoman's effort to try to do that and to try to listen to all sides as to how that should be done. And I think one of the things that I'd like to say just because my time is running and I want to talk about the OSS thing quickly, is that the issue that MCI brings about this, what becomes now $138 million after $68 million is subtracted, is that they claim that that wasn't reasonable. And I think that, you know, there are more specific aspects of what the FCC told us to do that encompass the concepts of reasonableness. I don't think they can point to anything that the FCC actually asked us to do that we did not do. And it's just a question of judgment and, you know, a judgment that we made given the evidence that was before us. And that's an important comment to make. And the second one is that they also accuse us in terms of evidence that the decision they made was arbitrary and capricious. And I find that a little hard to believe since we were actually doing what they wanted. And if we had done exactly what they wanted, I doubt they'd say that was arbitrary and capricious. We did a fourth to one-third of what they wanted and then because we didn't do the rest, now all of a sudden our argument has become arbitrary and capricious. Finally, just to save the rest of the time for the questions, I know this is terribly complicated and, you know, you want to ask me, I hope that you feel satisfied with what I've said. No, I don't feel satisfied. You tried. I tried. Okay, well, anyway. On the OSS question, I think the thing we just wanted, I mean, in a way, I answered some of that when I was talking about it with you. I think the important thing to note is that we, there were two questions. There was a recurring cost question and a one-time question. The one-time question has been settled. They settled that. We acknowledged in our order that there quite very well could be one-time costs that might come up when you're setting up this kind of a net, you know, change in the network. What we were wondering about is whether there really could be, how large the recurring costs would be. And that would be entirely dependent on how big the market was. And at the time, there was hardly any market, so therefore we didn't feel that that mattered. But we did have given them the opportunity to come back, and we still have our open to them coming back, if, in fact, they can prove their case. I guess I have another minute here, and I maybe will try to continue to see what I can say to help you understand. Maybe you could ask me a question that I could. No, what I asked for was could you point me to something in the order or in the writings of the PUC that would help persuade me that what $996 million is is an allocated common cost instead of a true common cost. And I think I'm just going to have to go back and reread the order and find it myself. Or perhaps I can ask our counsel. Well, I think the counsel from Pacific will be able to answer that question for you. Let me just see if I've got three or four seconds to use them wisely. I think I want to emphasize that this was an extremely fact-based case. I mean, this involved several cases, but this was a proceeding that went on for four years. And that it's important to realize that the PUC, you know, held a tremendous amount of hearing, listened to everybody, heard everyone's position, had no preconceived idea of what we wanted to do in this case. And we were given a very difficult task by the FPC, and I think that we did what I consider to be we followed federal law, and we didn't do anything that was arbitrary and capricious. And I think those are really the only two issues here. It's a complex case, but it's also a very simple legal case. It seems to me that the PUC did work very hard at this. The evidence is just everywhere in front of us. I don't think the PUC had a particular bias. I don't think the PUC had a dog in this fight. Thank you. Thank you. Thank you, Your Honor. I have very little time remaining, so I will use it sparingly. First, just to make clear in response to something I think the counsel for PUC suggested, we're not here at this stage challenging the choice of the number of the $68 million versus the $200 million. That was part of the appeal below, but it's no longer in the case at this stage. Part of the briefs, too. Pardon? I mean, the briefs argue quite a bit about the $68 million. Right. But in the district court, we are also challenging the actual selection of the number in the numerator. That is the reduction of the direct retail cost here. We're not challenging it. One of the concerns I have now is I think that some of our difficulties stem from the fact that we look at costs as being one pie, part of which is wholesale and part of which is retail. And we're concerned because the denominator only has part of the pie in it. But I'm wondering whether our concept is wrong and whether they've invented a whole pie that is wholesale costs and have stuck that in the denominator, and that that hypothetical whole pie would overlap with some of the pieces of the retail cost pie so that we're looking at a bit of a distortion. Your Honor, I suggest that that cannot be done because of the reason we suggested before, that one cannot separate out those types of costs with the numerator. And secondly, even if one theoretically could, that was not done here, if one looks back at the record from the 1998 order. In particular, the language that Judge Fletcher mentioned from the 1998 order, what the TUC was clearly doing in 1998 was determining, and this is ER 68, that those expenses, that the certificate designated as shared common, indicates that some of those costs cannot truly be considered common because they have a clear retail component. So they remove those direct, and later on the same page, just to support that same concept, it says the principal items that we are directing to be excluded, that's the $68 million, are expenses associated with retail sales and marketing activity, retail customer service activity, and amounts for general administrative expense that are derived by averaging the number of wholesale loops sold against the total number of active lines. So it's clear that the principal items are direct retail costs. And to the extent that that last category, the portion of the wholesale loops, is some subset effort to do the preallocation, we suggest that, as we said in our briefs, that perhaps they simply got the percentages backwards in that respect, but it's clear that these are direct retail costs that they were removing in the 1998 order, so they cannot justify it. I'm a little confused by your position. Do you have a different number in mind? Obviously, you think the number should have been reduced by more than $68 million, but how much more? No, Your Honor, just to be very clear, at this stage in the appeal, we are not claiming that the number $68 million was incorrect. Rather, we're claiming that the number $68 was an attempt to remove direct retail costs from the common cost bucket, which is the numerator. Having done so, those truly common costs then must be allocated among both wholesale and retail, and so you must include both in the denominator to come up with a markup. In the district court, we are also challenging the amount of the direct that was removed, but that's no longer part of the case. You say in the denominator you must include both wholesale and resale. You also argue, or are you continuing to argue, that Category 3 costs should be included in the denominator? We are, Your Honor. We understand that there are additional issues with respect to the Category 3 and unregulated services as to why those should or should not be included, and I would respectfully refer, Your Honor, to our brief as to why those still should be included as well. But if we don't get that... There's a different argument as to why the costs, the overhead costs, or the common costs attributable to the Category 3 are not included in the 996. There is an additional reason, the justification they give for why those should be excluded. The other argument is whether or not retail would apply to both, so we have to get past that hurdle first. But there is an additional reason, and very briefly to respond to that on Category 3, besides referring to what we said in our briefs, is it's very clear in the FCC's order that Pacific Bell had the obligation, the burden, to prove both the nature and magnitude of its common costs. To the extent it's now trying to show that there was some sort of transfer pricing mechanism, a billing mechanism internally, which already had taken out the common cost pocket, the costs that were associated with the Category 3 and unregulated, then it's a burden to show that, and I just don't see that on this record. Just one last point. I think part of the confusion in our interpretation, our view of this, is guided by what the FCC has said, that these are firm-wide common costs, and I pointed the Court to the provisions of the FCC's order which suggest that. The District Court, for its part, also relied on one of the same paragraphs from the FCC's order, but I think, respectfully, I think the District Court misread that one provision, causing the confusion that led to the District Court's opinion. That was the FCC's Paragraph 696. What the District Court said about that paragraph, 696, was the FCC's local competition order, this is from the District Court's opinion, the FCC's local competition order supports this conclusion, that is the conclusion not to allocate to retail. By stating that, quote, one reasonable allocation method would be to allocate common costs using a fixed allocator such as a percentage markup over the directly attributable for-looking costs, close quote. And then it says, and then the District Court said, specifics directly attributable for-looking costs in a hypothetical environment in which the specific is solely a wholesaler, consists of only the direct cost of unis and must exclude retail services and Category 3 services. And that's what the District Court said. I respectfully suggest that that's a misreading of that provision from Paragraph 696. The District Court seems to be reading that provision, that paragraph, as saying that one places a percentage markup over the directly attributable for-looking costs, meaning over in the sense of over a denominator. I respectfully submit, though, that that's not what that paragraph means because what would be over the denominator must be the numerator, and what it says should be over it, though, is a percentage markup. A percentage markup is actually the result of the ratio, not the numerator. It's not the common cost. The percentage markup is the result of the ratio, and what it's talking about over the common cost, what it's talking about is the application of the rate of the percentage to the cost. When you come up with a cost of individual elements, you say that the percentage is 5%. You mark it up by 5%. We understand. If you put in the denominator all of the wholesale costs, which are there, and you add the retail costs, do you have more than 100% of the costs that are really likely ever to occur in a real-world scenario? Do you have all the costs in the denominator? Yes. No, because these are the wholesale and the retail costs, which are separate. These are the direct retail costs and the direct wholesale costs. I just wonder if they had to calculate the wholesale costs as they would be if the whole system were wholesale, whether you wind up then adding in retail costs. You're overlapping. You've created a mythical world where 100% is wholesale, and then you're sticking something from the real world in on top of it. I don't know whether that's going to cause a dispersion. No, Your Honor. I think there is no overlapping, if you will, because the retail costs are distinct. The retail costs are things like the marketing, things like the retail customer service, which exist independent of the cost of the network itself, the physical lines and switches that comprise the network. They've been combed out all along the way. Another way of asking Judge Canby's question, at least I think it's another way of asking Judge Canby's question, what do you get? Instead of putting them into a denominator or numerator, you simply add common costs plus wholesale costs plus retail costs. That's a total, but what does that total represent? The total overall costs. The total overall costs. Common plus direct. I think that's the same answer that you gave to Judge Canby, that is to say there is no overlap between wholesale costs and retail costs. Correct. Because that's the total overall cost of the operation, of its operations. Okay. Thank you, Your Honor. Any further questions? Thank you. You've got 14 seconds, but we're really interested in finding out what's going on here, so let's go. We will not hold you to 14 seconds. Okay. With respect to Pacific Bell's cross-appeal, we have no objections, certainly, to answer Judge Canby's questions to providing a cost study. That's what we've been looking for all along. Now, the notion that we should have to bring a petition for modification to do so fails for two reasons. One, that puts the burden on us to identify newly discovered evidence, okay, and it creates a heightened burden under the PUC's rules, which we don't think should apply. Mr. Sessions, what's wrong with that? We're in the best position to know what the costs are. Absolutely, Your Honor. We have no objection whatsoever to providing a cost study that the PUC finds adequate and litigating it. That's all we want to do. One problem- What? Did you send them a letter saying we're not coming back? Your Honor, we did not. What counsel is referring to was in the local competition proceeding, and the procedural history gets a little complicated here, but we were in this rate-making proceeding, the results of which are before you today. In that proceeding, we provided a cost study. PUC didn't like it, told us to go to the local competition proceeding. Fine by us. We don't really care. We just want an opportunity to show our cost. Seven months later, before we had an opportunity to develop that cost study and provide it, the PUC issued a decision, and this is reproduced in the addendum to our brief at approximately page 34 through 38, issuing a decision saying the costs that were eligible for recovery in that local competition proceeding have nothing to do, and that's a direct quote, nothing to do with Section 251C.3, which is the statutory requirement that makes us provide unbundled network elements in the first place, including OSS, and that instead that proceeding was devoted exclusively to implementation costs, which the PUC had defined as non-recurrent. We were looking for recurring costs associated with a network element. That decision was clear as day to us, so we thought, fair enough, we'll just go back to where we started. After that decision, we wrote a letter saying, yes, OSS recurring costs are not, we're not going to proceed on this proceeding simply because you've already told us we can't. So then we came back to the rate-making proceeding, at which point the PUC said, aha, you didn't seek rehearing of the first decision. Well, that really didn't make any sense to us. We didn't have any reason to complain at that point. Okay, but I heard Ms. Duma say that what you can do now is to simply come back with a new cost study and, in essence, ask for a new rate. Well, the first we saw of that, Your Honor, respectfully, was in the reply brief here. We came back to the rate-making proceeding. They said, no, you're barred because you didn't seek rehearing. We sought rehearing on that subsequent decision. They said, no, you're barred because you didn't seek rehearing initially. The other concern with simply initiating a new proceeding, if you will, is that once the PUC would set a rate, it would apply only on a forward-looking basis. We've been doing this for seven years. You wouldn't have any way, once that rate was set, to go back and say, we've been doing this on behalf of the competitors for seven years. We at least get an opportunity to show that we should be compensated on a backward-looking basis. I'd be happy to address, my rebuttal was intended, obviously, in support of the process. I don't know if you carefully combined your rebuttal to the cross-appeal, but I do have a question. I'm trying to figure out what the universe of costs is. And if you add to the denominator retail costs, why doesn't that resolve in a proper allocation of the costs? Because, Your Honor, in the PUC's words, it mixes apples and oranges. We have in the denominator the entire cost of the network. This is what I've been trying to get at. I'm concerned about this. I'm concerned that the denominator is a mythical world of 100%. It is, Your Honor. It's the entire network, every single line in the network. Some things are in there because they would be retail costs if they were a retail operation. The lines that we're using today in practice to provide retail services, they're in the denominator. They're costed according to the FCC's wholesale methodology, but they're in there. And so if you try to lump in retail costs on a service-specific basis, you've already got the wholesale costs associated with that service in the denominator. Now, if you want to add in retail costs to this entire equation, what you would have to do is essentially start over. You have to identify what are the shared and common costs of everything and stick it in the numerator. Now, there's no dispute here, but that's not what's in the numerator. So if you want to do... Did you say there's no dispute that that's not what's in the numerator? That shared costs associated with retails, I don't think there's any dispute. That shared costs associated with retail services, and I go back to my initial example of a building in which the sales representative of Pacific Belfast sits. That's a shared cost. You cannot allocate it to a particular service, and that's out. Okay, that's gone. Now, if you wanted to put retail costs in the denominator, you'd have to put the shared costs in the numerator as well. You have to make it apples to apples, however you want to do it. And are you using the word shared costs now as differentiated from common costs?  You were using, as I understand it, common costs to refer to a cost that cannot be differentiated between retail and wholesale, and that's correct. The common costs, the way they've been used in this appeal, include both true common costs, as you've described them, as well as shared costs. And shared costs are distinct. Shared costs, again, are something that you can differentiate between wholesale and retail. But differentiate or allocate? Allocate. Of course you can allocate common costs, too. That's what we're required to do. You can allocate them only in a percentage way. You can't allocate them to particular elements or particular services, and that's what I mean by saying you cannot allocate them. But they are incurred in the provision of a type of business, wholesale or retail. So the shared costs that are in the numerator, and I go back again to the costs associated with the account team. That's a shared wholesale cost. It's in the numerator. Okay? It cannot be attributed to a network element, and that's the core sense in which we're using the term common costs. It really respectfully refers to shared and common costs, and that's why you see throughout the PDC's opinion the shared and common costs markup. But what we mean to say is that in the numerator are costs, shared and common costs. That we would incur in this hypothetical wholesale-only world that cannot be attributed to a particular network element. You can't figure out exactly how much of that goes on the loop and how much goes on the switch and how much goes on the transport facility. So we incur these in this hypothetical world in the denominator. You have every loop and every switch. And again, I just return to my initial point, which is that in practice, in practice, if MCI doesn't buy any unis, they don't pay a dime. If MCI buys 10% of the network, they pay 10% of this numerator. Pacific is using the remaining 90% of these network elements that, as can be indicated, are in the denominator. Pacific's using that network, and Pacific is paying the remaining 90%. I think this is what you've said to us already. Yes, fair enough. Thank you, Your Honor. Now, would you like two minutes to respond to that? Because we've kind of gone back and forth here, and I think a couple of minutes would be fine. I think maybe even just one, just to respond to one of those points. Because the PUC itself talks about apples to oranges or apples to apples mixes, and Pacific Bell presses that metaphor here. Just to be clear, under the FCC's definitions and the FCC's interpretation, what we're proposing is apples to apples, because the FCC's numerator of common cost buckets is firm-wide common costs. And so, therefore, it makes sense for apples to apples to be allocated among firm-wide direct costs. So that is an apples to apples comparison. And even if the court or the PUC or Pacific Bell disagrees with that kind of approach, I suggest that this court in U.S. West v. Hamilton several years ago, in looking at the FCC's local competition order of 1996, the same order, albeit different substantive issues at stake, said that even where the court in that case had serious doubts, close quote, about the FCC's analysis and interpretation, nonetheless it was bound to give it effect and to follow the order. And so the FCC's view here is that the apples are firm-wide common costs, and therefore they should be allocated among firm-wide direct costs. Thank you, Your Honor. Thank you. A difficult case, ably argued. The case of MCR Worldcom v. Pacific Bell is now submitted. And we are in recess until tomorrow morning.
judges: Canby, W. Fletcher, Tallman